1  ROSMAN & GERMAIN LLP
2  Daniel L. Germain (Cal. Bar No. 143334)
   16311 Ventura Blvd., Suite 1200
3  Encino, CA 91436-2152
   Telephone: (818) 788-0877
4  Facsimile: (818) 788-0885
5  E-Mail: Germain@Lalawyer.com

6  *Attorneys for Plaintiff*
7
   (Additional counsel listed on signature page)
8
9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11                  SOUTHERN DIVISION

12 | COLLEEN WITMER, Derivatively on ) | Case No. 8:18-cv-00246-CJC (DFMx) |
   Behalf of BANC OF CALIFORNIA,
13 INC,                             )     **FIRST AMENDED VERIFIED**
                                    )     **SHAREHOLDER DERIVATIVE**
14              Plaintiff,          )     **COMPLAINT FOR BREACH OF**
                                    )     **FIDUCIARY DUTY AND UNJUST**
15         vs.                      )     **ENRICHMENT**
                                    )
16 STEVEN A. SUGARMAN, RONALD )
   J. NICOLAS, JR., ROBERT D.       )
17 SZNEWAJS, CHAD T.                )
   BROWNSTEIN, HALLE J. BENETT,     )
18 DOUGLAS H. BOWERS, JEFFREY       )
   KARISH, RICHARD J. LASHLEY,      )
19 JONAH F. SCHNEL, ERIC L.         )     **JURY TRIAL DEMANDED**
   HOLOMAN, J. FRANCISCO A.         )
20 TURNER and JEFFREY T. SEABOLD )
                                    )
21              Defendants,         )
                                    )
22         – and –                  )
                                    )
23 BANC OF CALIFORNIA, INC,         )
                                    )
24              Nominal Party.      )
                                    )
25 _____
26
27
28

Plaintiff Colleen Witmer ("Plaintiff"), by and through her undersigned attorneys, hereby submits this First Amended Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Banc of California, Inc. ("Banc" or the "Company") against certain members of its Board of Directors (the "Board") and current and former executive officers, seeking to remedy, among other things, defendants' breaches of fiduciary duties concerning related-party transactions and false and misleading statements to stockholders.   Plaintiff makes these allegations upon her personal knowledge and the investigation of counsel, which includes review and analysis of: (a) public filings made by Banc and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by defendants and other related non-parties; (c) news articles, shareholder communications, and postings on Banc's website; (d) the proceedings in a related securities fraud class action captioned *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM, pending in the United States District Court for the Central District of California (the "Securities Action"), and (e) other publicly available information concerning Banc and defendants.

## NATURE OF THE ACTION

1.     This shareholder derivative suit arises from a board that not only breached its duties by allowing senior management to repeatedly pilfer value from the Company through related party transactions, but also implicated themselves by drinking from the same dirty trough.  Then, when their improper misconduct began to be revealed to the world, the Board repeatedly covered up its participation in the scheme, destroying a once-respectable bank's credibility and resulting in hundreds of millions of dollars in lost stockholder value.

2.     Unwilling (for obvious reasons) to perform any real investigation of the widespread misconduct they oversaw and committed, the Board and management has repeatedly used conflicted directors and company counsel to engage in sham investigations in order to cover up the Board's own complicity and liability.  Worse yet,

- 1 -

when the board and senior management began pointing fingers at each other, they realized that any *bona fide* investigation exposed each one of them to a "mutually assured destruction" dynamic.  Rather than uncover a truth that smeared all their names, the Board and management entered sham "mutual releases" in a desperate effort to avoid anybody being held accountable, leaving the public stockholders with the bag.

3.     Consistent with applicable law, Plaintiff made a demand (the "Demand") on the Board that they take action against certain directors and officers, many of whom remained on the Board at the time of the Demand.[1]   The Board, however, wrongfully refused that Demand.  The result of that refusal is to empower Plaintiff to pursue the valuable claims belonging to the Company.

4.     Banc is a financial holding company operating in commercial banking, mortgage banking, financial advisory and corporate banking.  Banc is the parent of Banc of California, National Association ("Banc N.A."), a national bank.

5.     In 2010, defendant Steven A. Sugarman ("Sugarman"), the owner and managing member of an investment firm known as COR Capital LLC ("COR"), joined the Board of Directors of Banc's predecessor, First PacTrust Bancorp, Inc. ("FPB") (the "FPB Board").  Two years later, in 2012, Sugarman became Chief Executive Officer ("CEO") of FPB.  Shortly thereafter, in July 2013, FPB renamed itself Banc of California, Inc., touting itself as a "community reinvestment" lender.  Under Sugarman's direction, Banc grew from less than $1.5 billion in assets to more than $10 billion in assets by 2016.

6.     On October 18, 2016, however, investors began to learn, beginning with publication of an article entitled, "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible," that Banc insiders were irreparably intertwined with a convicted fraudster.  The article laid out an intricate web of ties between Jason Galanis ("Galanis"), who has been convicted of running multiple multi-million dollar

---

[1] A copy of the Demand is attached as Exhibit A.

securities fraud Ponzi schemes, and Banc's senior most officers and directors, including defendant Sugarman.  The article, published on the *SeekingAlpha* investor website, said Galanis has a "long history of secretly gaining control of banks and public companies via front men, looting assets, and leaving unsuspecting investors and taxpayers with hundreds of millions in losses."

7.     The *SeekingAlpha* article concluded that: (1) Galanis, through a network of related corporations and limited liability companies, had indisputable ties to Sugarman, COR and other Banc insiders; (2) an off-balance sheet lender controlled by Sugarman and other Banc senior executives was used as a means to finance Galanis's fraudulent schemes and transfer fraudulently obtained assets; and (3) Banc's Lead Independent Director, Chad T.  Brownstein ("Brownstein"), had material financial ties to Sugarman and COR, undermining the Banc's assertions of Brownstein's independence to justify his approval of related-party transactions benefitting Sugarman and his family.[2]

8.     When the world began to learn about the corruption at the top of the Banc, the Board recognized that it had utterly abandoned its duty to adequately oversee the Company's business operations.  The Board had done nothing to stop this misconduct by senior management because the Board itself benefited from related party transactions, albeit on a smaller scale.

9.     Unable to take control of the situation after the article came out, the Board responded with half-truths, and outright misrepresentations, about what it knew and when it learned facts that should have triggered claims against Sugarman and other Board members.  The Board tried to hide behind a conflicted investigation by a law firm that was also representing Sugarman personally, but the investing public uncovered the ridiculousness of that sham.  The Board tried to deny and delay, but yet again, investors

---

[2]     Following publication of the *SeekingAlpha* article, and in response to Banc's denial of the allegations, the article's author created a website where all of the author's research was downloaded.  The website is www.bancexposed.com and includes links to hundreds of pages of documents that support the author's conclusions.

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    would not stand for it.

2        10.    Faced with growing public outcry, the Company's auditor, KPMG, sent a

3    letter requesting that the Board finally investigate Banc's ties to Galanis and the newly

4    surfaced trail of related party transactions.  The Board was thus obligated to establish a

5    Special Committee.  However, the Special Committee members quickly realized that

6    defendant Sugarman and other directors and executives were unwilling to go down

7    without a fight, and would take the other directors down with them.

8        11.    Almost immediately after the Special Committee was formed, numerous

9    executives began blowing the whistle on the Special Committee members for engaging

10   in their own related party transactions and concealing other misconduct at the Company.

11   In essence, the Special Committee and the corrupt inside manager all now faced

12   mutually-assured destruction.

13       12.    Rather than investigate in good faith, the Special Committee members cut a

14   deal with the devil they created, paying defendant Sugarman a substantial sum of money

15   to walk away in exchange for Sugarman and the Board agreeing that neither party would

16   file, attempt to file, or otherwise pursue claims against one another.  The Board actually

17   agreed to a release of liability for Sugarman without any litigation pending at the time.

18   This self-interested, quid pro quo is neither valid nor fair under Maryland law.

19       13.    Further, the Board, with the assistance of Morrison & Foerester LLP,

20   approved a similar settlement agreement with Jeffrey Seabold ("Seabold") on February

21   14, 2018.  Astonishingly, the Seabold settlement agreement contained a provision that

22   expressly referenced the exact entities alleged to have funded Galanis's fraudulent

23   scheme.  In the agreement, Seabold agreed that those entities would be dissolved by the

24   Effective Date of the Agreement (February 22, 2018) and would no longer operate out of

25   Banc's principal place of business.  Thus, while the Board falsely portrayed to

26   shareholders that the ties to Galanis were of no importance in February 2017, it

27   subsequently admitted in the Seabold settlement agreement that those ties were in fact

28   completely true, and that Banc's facilities had been purloined for the use of the

fraudulent business activities.

14.     The Board's concealment of its relationship with Galanis triggered a Securities Action in the U.S. District Court for the Central District of California (the "Federal Court").   On September 6, 2017, the Federal Court denied Banc and Sugarman's motion to dismiss the complaint in substantial part, finding that the lead plaintiff in the Securities Action had particularly alleged that certain statements, including notably the Company's 2015 proxy statement, were false and misleading.

15.     The securities class action complaint recently survived a motion to dismiss. There, the Federal Court upheld the complaint's allegations that defendants: (1) omitted material information from their public statements about numerous connections CEO Sugarman and other top Banc executives and directors had with convicted securities fraudster Galanis; (2) misled investors about the independence of Banc's "disinterested directors" in its SEC filings in connection with their approval of related-party transactions that put millions in the pockets of Sugarman and his family; and (3) failed to disclose that Banc's management was in the midst of an internal investigation into the Company's ties with Galanis.

16.     Accordingly, as a result of defendants' breaches of fiduciary duty and other serious misconduct, the Company has been egregiously damaged.

17.     On November 15, 2017, Plaintiff sent a written pre-suit demand demanding that Banc's Board take action against those responsible for the damages the Company has suffered and is certain to suffer.   A true and correct copy of the Demand is attached hereto as Exhibit A.

18.     On December 4, 2017, attorney Mark McDonald ("McDonald") of the law firm Morrison Foerster LLP ("MoFo") responded on behalf of the Board (the "December 4 Letter").   The December 4 Letter stated that "[w]e are evaluating your request and will respond in due course.   We expect that you will not initiate any litigation purportedly on behalf of the Company without further communication from us."   A true and correct copy of the December 4 Letter is attached hereto as Exhibit B.

19.    The "further communication" arrived on January 8, 2018 (the "Refusal").[3] Therein, Mr. McDonald informed Plaintiff of the following:

> As I'm sure you know, a purported shareholder derivative lawsuit was previously filed and is pending, and the Company has filed a motion to dismiss that action on the grounds among others that the shareholder failed to make a demand on the Company nor established that demand would have been futile. ***The Company has determined that it would be inappropriate for the Company to assert claims directly while that purported shareholder derivative action is pending***.

(Emphasis added).

20.    The shareholder derivative action referred to by the Refusal is *Gordon v. Snewajs, et al.*, Case No. 17-cv-1678 (the "Demand Futility Action"), which was pending in this Court at the time Plaintiff issued her Demand on the Board. Unlike the instant action, the Demand Futility Action was filed by a shareholder who had not first served a pre-suit demand on the Board.

21.    Mr. McDonald and MoFo served as defense counsel in the Demand Futility Action, and has served and continues to serve as defense counsel in the Securities Action, and were doing so when the Demand was issued to the Board. Inexplicably, although the Board was and is duty-bound to undertake an independent investigation upon receipt of a shareholder demand, the Board referred the Demand to decidedly non-independent counsel, who in fact had negotiated the Seabold and Sugarman Releases. Thus, the response to the Demand could not have been, and is not, the product of independent, good faith business judgment.

22.    Although MoFo has since attempted to continue carrying on the charade of an independent investigation, asking Plaintiff to stand down in a recent letter (attached as Exhibit D), it is too little, too late. The Board has already refused the Demand, and the current "investigation" is plagued by irreconcilable conflicts.

---

[3]    A true and correct copy of the Refusal is attached hereto as Exhibit C.

23.     In light of the foregoing, the Board's refusal is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company and its public stockholders.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

25.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district. Additionally, nominal defendant Banc is headquartered in this district.

## THE PARTIES

26.     Plaintiff is a shareholder of Banc and has continuously held Banc stock since July 2005.  Plaintiff is a citizen of Pennsylvania.

27.     Nominal defendant Banc is a Maryland corporation with its executive offices located at 3 MacArthur Place, Santa Ana, California 92707.  According to its public filings, the Company is a financial holding company operating in commercial banking, mortgage banking, financial advisory and corporate banking.  Banc is the parent of Banc of California, National Association, a national bank.

28.     Defendant Sugarman served as the Company's CEO from 2012 until January 2017 and a director from 2010 until January 2017.  Before and during the

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Relevant Period, defendant Sugarman owned and controlled COR, the entity that led the 2010 recapitalization of Banc.  Before and during the Relevant Period, Sugarman also owned and/or controlled COR Securities Holdings, Inc. ("COR Securities"), its subsidiary COR Clearing LLC ("COR Clearing") and COR Advisors LLC ("COR Advisors").[4]  Upon information and belief, defendant Sugarman is a citizen of California.

29.     Defendant Ronald J. Nicolas, Jr. ("Nicolas") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President ("EVP") from November 2012 to November 2015.  Upon information and belief, defendant Nicolas is a citizen of California.

30.     Defendant Robert D. Sznewajs ("Sznewajs") has served as the Chairman of the Board since January 2017 and as a director since 2014.  In addition, defendant Sznewajs served as a member of the Board's Joint Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Sznewajs is a citizen of California.

31.     Defendant Chad T. Brownstein ("Brownstein") served as a director of the Company from May 2011 until February 2017 and as Vice Chairman and Lead Independent Director from 2013 until January 2017.  Upon information and belief, defendant Brownstein is a citizen of California.

32.     Defendant Halle J. Benett ("Benett") has served as a director of the Company since 2014.  In addition, defendant Benett served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Benett is a citizen of California.

33.     Defendant Douglas H. Bowers ("Bowers") has served as the Company's President and Chief Executive Officer ("CEO") and director since May 2017.  Upon information and belief, defendant Bowers is a citizen of California.

34.     Defendant Jeffrey Karish ("Karish") served as a director of the Company

---

[4]     "COR" will also refer to COR Securities, COR Clearing and COR Advisors.

1   from October 2011 until May 2018.  In addition, defendant Karish served as a member of

2   the Audit Committee during the Relevant Period.   Upon information and belief,

3   defendant Karish is a citizen of California.

4       35.    Defendant Richard J. Lashley ("Lashley") has served as a director of the

5   Company since February 2017.  In addition, defendant Lashley served as the chairman of

6   the Audit Committee during the Relevant Period.   Upon information and belief,

7   defendant Lashley is a citizen of New Jersey.

8       36.    Defendant Jonah F. Schnel ("Schnel") has served as a director of the

9   Company since April 2013.  Upon information and belief, defendant Schnel is a citizen

10  of California.

11      37.    Defendant Eric L. Holoman ("Holoman") served as a director of the

12  Company from July 2013 until June 2017.  Upon information and belief, defendant

13  Holoman is a citizen of California.

14      38.    Defendant J. Francisco A. Turner ("Turner") served as the Company's Chief

15  Strategy Officer and EVP from November 2015 until June 2017, as its Principal

16  Financial Officer from September 2016 until January 2017, as its Interim CEO from

17  January 2017 until June 2017, and as its interim President from January 2017 until May

18  2017.  Upon information and belief, defendant Turner is a citizen of California or

19  Nevada.

20      39.    Defendant Seabold previously served as the EVP and Management Vice

21  Chairman of Banc N.A. from July 2016 until September 5, 2017.    Upon information

22  and belief, defendant Seabold is a citizen of California.

23      40.     Collectively, defendants Sugarman, Nicolas, Sznewajs, Brownstein, Benett,

24  Bowers, Karish, Lashley, Schnel, Holoman, Turner and Seabold shall be referred to

25  herein as the "Defendants."

26      41.    Collectively, defendants Sznewajs, Benett, Karish and Lashley shall be

27  referred to herein as the "Audit Committee Defendants."

28                         **SUBSTANTIVE ALLEGATIONS**

## A.      Company Background

42.      According to its public filings, Banc is a financial holding company operating in commercial banking, mortgage banking, financial advisory, and corporate banking.  Banc is the parent of Banc of California, National Association, a national bank.

43.      Banc was the brainchild of longtime associates Brownstein, former Lead Independent Director, and Sugarman, former CEO.  In 2010, Brownstein and Sugarman led a $60 million recapitalization of Banc's predecessor, FPB, with Sugarman's COR serving as the lead investor.

44.      In 2010, Sugarman became a FPB board member and, in 2012, became CEO.  At 38, and with no prior experience running a bank, Sugarman was the youngest CEO of a bank with a market value exceeding $500 million.

45.      Brownstein was brought in to serve as a non-executive, independent director in 2011.  As discussed below, however, the representation that Brownstein was independent would later be exposed as a blatant lie given his undisclosed business relationships with Sugarman.

46.      In July 2013, under Sugarman's direction, FPB re-launched itself as Banc.

47.      Banc's assets grew from $1 billion in 2010 to over $10 billion by 2016. Banc's growth was fueled by acquisitions, many of which were related-party transactions involving Sugarman-related entities.  The following related party transactions illustrate the corrupt nature of Sugarman's reign as CEO in which he abused his fiduciary position to benefit his family members:

(a)      September 16, 2013:  Banc acquired The Palisades Group.  As of July 1, 2013, just prior to the acquisition, Jason Sugarman, Steven Sugarman's brother, entered into a consulting agreement with the Palisades Group for a term of 5 years pursuant to which he would earn quarterly payments of $30,000 (worth $600,000 in aggregate quarterly payments), not including bonus payments in exchange for advisory services to financial institutions and other institutional clients related to investments in residential mortgages, real estate

and real estate related assets. Jason Sugarman earned over $1.3 million pursuant to the agreement, including $30,000, $1.2 million, and $121,000 in base and bonus payments for the years ended December 31, 2015, 2014 and 2013, respectively.

(b) <u>October 31, 2013</u>: Banc acquired CS Financial, a company that was controlled by then-Banc director Seabold.[5] Relatives of Steven Sugarman, including his brother Jason Sugarman, sister-in-law Elizabeth Sugarman (Jason's wife) and father Michael Sugarman, also had ownership interests in CS Financial. Upon closing of the acquisition, each owner was entitled to receive consideration in the form of shares of the Company's voting common stock. At closing, Jason Sugarman received 16,140 shares, Elizabeth Sugarman received 16,140 shares and Michael Sugarman received 3,228 shares of the Company's voting common stock. Furthermore, all 103,663 shares that Seabold was supposed to receive upon closing of the merger were paid directly to Elizabeth Sugarman to repay a debt owed by CS Financial to an entity controlled by Elizabeth Sugarman.

(c) <u>August 23, 2016</u>: Banc announced an agreement to pay $100 million over 15 years for the naming rights of the new Los Angeles Football Club soccer stadium. The sponsorship is valued at $6.7 million per year, making it one of Major League Soccer's most expensive naming rights agreements and surpassing even some agreements in the NFL. Of course, Steven Sugarman's brother Jason Sugarman and Jason's father-in-law Peter Guber both have financial interests in the Los Angeles Football Club. The announcement

---

[5] Prior to the acquisition, the Company had entered into a Management Services Agreement with CS Financial for certain consulting services. For the year ended December 31, 2013, CS Financial received $439,000 under the Services Agreement. On May 13, 2013, the Bank entered into an employment agreement with Seabold to serve as Managing Director and Chief Lending Officer. In the employment agreement, Seabold granted the Company the option to purchase CS Financial for $10 million.

prompted the publication of a Bloomberg article entitled "CEO Helps Brother, Again, With $100 Million Soccer Stadium Deal."

**B.    Banc Insiders Were Secretly Enmeshed with Securities Fraudster Jason Galanis Through COR, Camden and Prospect Global**

48.    On October 18, 2016, a blog post on *Seeking Alpha* alleged the existence of a web of improper relationships between Jason Galanis ("Galanis"), a Los Angeles financier and convicted securities fraudster, and Banc's senior managers, including Sugarman and Seabold, and directors, including Brownstein (the "*Seeking Alpha* Article").   Immediately, the *Seeking Alpha* Article sparked public outrage because Galanis had a criminal reputation for using frontmen to loot publicly-traded banking institutions.

49.    According to the *Seeking Alpha* Article, from 2011 until 2017, Sugarman owned COR, the entity that led the 2010 recapitalization of Banc predecessor, FPB. According to research conducted by the *Seeking Alpha* article's author, COR was part of a group of companies and investment-related entities with direct or indirect ties to Galanis.

50.    Although investors were unaware of Galanis's ties to Banc and its top leadership, Galanis's white collar criminal activities were no secret.   On September 24, 2015, the United States Department of Justice ("DOJ") and the SEC charged Galanis with orchestrating multiple schemes to defraud investors of millions of dollars.

51.    Specifically, from 2009 to 2011, Galanis, along with six others, engaged in a scheme to defraud the shareholders of a publicly-traded company called Gerova Financial Group, Ltd. ("Gerova").   As part of the scheme, Galanis fraudulently generated demand for Gerova stock by bribing investment advisers to purchase for client accounts the Gerova stock that was sold by Galanis and others, thereby enabling Galanis to cash out from the scheme and make millions in illegal profits.   Galanis pled guilty to these charges in July 2016 and was sentenced to an over eleven-year prison term in February 2017.

52.    In May 2016, while out Galanis was out on bail for the Gerova fraud, the DOJ and SEC again criminally and civilly charged him with securities fraud, this time in

connection with orchestrating a Ponzi scheme to defraud investors and a Native American tribal entity of tens of millions of dollars ("Tribal Bond Scheme"). A former director of Sugarman's COR Securities, Hugh Dunkerly ("Dunkerly"), was also charged with securities fraud in connection with the Tribal Bond Scheme. Pursuant to the Tribal Bond Scheme, between 2014 and 2016, Galanis, Dunkerly and other co-conspirators induced a Native American tribal entity to issue bonds based on lies about how the bond proceeds would be invested. Galanis and the others pocketed the bond proceeds to pay for their own personal expenses, homes, cars, travel, and jewelry. Galanis also allegedly defrauded unwitting investors into buying the bonds by hiding other material facts about them, including their lack of liquidity. Galanis pled guilty to the Tribal Bond Scheme in January 2017.

53.      As disclosed in the *Seeking Alpha* Article, Sugarman's COR and Galanis controlled the same offshore insurance company, Valor Group ("Valor"), a Bermuda-based insurance holding company. Valor and its subsidiaries were central to the Tribal Bond Scheme and were controlled by Galanis to carry out the fraud. According to the SEC, Galanis controlled Valor and its subsidiaries and used them to bribe investment managers to purchase Tribal Bonds on behalf of their clients. Sugarman's brother, Jason Sugarman, who was also a consultant with one of Banc's subsidiaries, was chairman and CEO of Valor during the Tribal Bond Scheme. Dunkerly, a former COR director, incorporated Valor while still at COR, and served as President of Valor while still at COR.

54.      As disclosed in the *Seeking Alpha* Article, and confirmed by public records, Valor's subsidiary Wealth-Assurance also played a role in the Tribal Bond Scheme. Wealth-Assurance's website confirms that in 2014 it was "majority-owned by the strong US financial group COR Capital." Burnham Securities, who acted as the placement agent in the Tribal Bond Scheme, was also part of COR and, according to documents obtained by the SEC, operated out of the same building as Banc's corporate headquarters during the fraud.

55.      In addition to his control over Valor, Galanis used COR to demonstrate his

financial backing to acquire the investment firms used to perpetrate the fraud. A June 2014 email from Galanis to a co-conspirator attached a document titled "Introduction to COR Capital," which Galanis used to demonstrate his financial backing for acquisition of the investment firms. During the Tribal Bond Scheme, Galanis also represented to his co-conspirators that he controlled companies associated with COR, including COR itself. According to the SEC, Galanis installed officers at COR to conceal his control.

56.    Sugarman also held a majority interest in an entity named JAS Partners 1, LLC ("JAS Partners"). JAS Partners, along with Banc's Vice-President Seabold, controlled Camden Capital Partners, LLC and its off-balance sheet lender Camden Real Estate Opportunity Fund I (collectively, "Camden"). According to the *Seeking Alpha* Article, and based on public records, in 2014 and 2015, Camden was used to provide personal and business loans to Galanis amidst the Tribal Bond Scheme and was utilized for transactions with Galanis during the Gerova securities fraud. In essence, Camden provided Galanis the necessary liquidity to conduct his frauds.

57.    Camden also provided insiders with loans that were neither disclosed nor in the best interests of Banc. For example, Lead Independent Director Brownstein accepted an undisclosed loan from Camden, secured by his Los Angeles Mansion, but the loan actually appears to have financed his outside business ventures.

58.    The research conducted by the *Seeking Alpha* Article also revealed ties between Galanis and Banc's Lead Independent Director Brownstein. In 2011, a private investment firm nominally run by Brownstein, was a major investor in Prospect Global Resources Inc. ("Prospect Global") and Brownstein served as Vice Chair of that company. According to the SEC complaint in the Gerova fraud, Galanis transferred proceeds he fraudulently obtained in connection with the Gerova fraud to Prospect Global, which the SEC identified as a company Galanis in fact controlled.

59.    By the start of 2015, Defendants were aware of the ties between Galanis, Sugarman, Brownstein, and Seabold. In 2015, Banc's management became aware of and initiated an internal investigation into Galanis's control over COR. As referenced below,

1    however, the Board would not disclose the existence of this investigation until 2016,

2    when investors first became aware of the public information.

3        60.     Defendants were or should have been aware of Galanis's lengthy history of

4    white collar financial crime, including indictments for taking control of Gerova and

5    defrauding shareholders, as well as the fact that Galanis was using Banc's name in

6    connection with the Tribal Bond Scheme and was controlling COR to run that scheme

7    out of the same building as Banc's headquarters.  Although Defendants knew or should

8    have known of Galanis's ties to Sugarman, Brownstein and Seabold, and Galanis's

9    control of COR, they concealed these facts from investors, protecting Sugarman's

10   interests ahead of Banc and its public investors.

11       61.     This was the first, but not the last, sham investigation orchestrated by the

12   Defendants to protect themselves from being held accountable for their fraudulent

13   conduct and related breaches of fiduciary duty.

14   **C.    The Company Responds with a Sham Investigation to Blunt the Impact of the**

15   **_Seeking Alpha_ Article**

16       62.     In response to the _Seeking Alpha_ Article, on October 18, 2016, Defendants

17   were forced to finally disclose to investors that they knew about these ties for over a

18   year, but failed to disclose this information.  To cover up the obvious fraud that had been

19   committed and was being committed, the Defendants falsely claimed that that the

20   Company, acting through its "disinterested directors," had already initiated a "thorough

21   independent investigation" led by Winston & Strawn and had received regular reports

22   from regulators over the past year concerning the matter.

23       63.     Defendants also disclosed the results of the purported "independent"

24   investigation, denying that Galanis had any control over the Company, or any entity

25   owned or affiliated with Sugarman.  Defendants, however, knew, but failed to disclose,

26   that the investigation was anything but independent because it was being directed by

27   management (who had a stake in the investigation's outcome) and Winston & Strawn

28   who had served as personal counsel for both Sugarman and Banc.

64.     The truth, which was later admitted by the Company, is that the "independent" investigation was actually conducted by management (*i.e.*, the same individuals involved in the wrongdoing) with the assistance of Winston & Strawn, who had personal ties to Sugarman, had previously represented both Sugarman and the Company, and actually received loans from Banc to finance the firm.

65.     The disclosures were in response to complaints from public investors, and therefore provided the Board the ability to blatantly lie.  But the lies would have to end.

66.     Shortly after the October 2016 press release, on October 27, 2016, the Company's independent auditor, KPMG, sent a letter to defendant Sznewjas in his capacity as Chair of the Audit Committee raising concerns about allegations of "inappropriate relationships with third parties" and "potential undisclosed related party relationships."  The Board now had to take some action to legitimately investigate the allegations in the *Seeking Alpha* Article.

67.     In response, the Board formed a special committee to investigate KPMG's concerns, with defendants Benett, Karish, Schnel, and Sznewajs appointed to lead the investigation (the "Special Committee").  Further, on October 30, 2016, the Special Committee retained WilmerHale to assist with the investigation.

68.     While the purportedly independent Special Committee investigated, Sugarman and other officers grew anxious at the prospect that they would not be able to control the investigation.  To ensure that the truth of their ties to Galanis would not be exposed, Sugarman and other executives took steps to blackmail the Special Committee members.  Although Sugarman's and the other executives' conduct was wholly self-interested, his need to protect himself unearthed additional facts that implicated the Special Committee members in severe misconduct risking exposure to civil liability.

D.     **Senior Officers Show Special Committee Members That They Will Go Down As Well**

69.     In two wrongful termination complaints, filed by former Banc Executive Vice President Carlos Salas ("Salas") and Seabold, similar allegations of related-party

transactions and fraud were made against each of the Special Committee members.  The following is a summary of that information:

(a)      Defendant Benett was employed, from April 2014 to August 2016, by KBW, Inc., an investment bank with ties to both Banc and its competitors. Defendant Benett did not disclose this relationship to the Board despite the fact its disclosure was required by Banc's internal policies.  Moreover, defendant Benett usurped corporate opportunities that belonged to Banc while working for KBW such as advising mortgage clients on merger and acquisitions transactions.  Defendant Sugarman pushed for defendant Benett's conflicts to be investigated but defendant Schnel, the chair of the Board's Governance Committee, declined.  Defendant Benett then informed the Board that he would not seek re-election to the Board.  Yet after the Special Committee concluded its investigation – where it found no wrongful conduct by anyone at Banc – and after the announcement of Sugarman's "resignation," defendant Benett reversed course and stood for re-election.  Defendant Benett remains on the Board to this day.

(b)      Defendant Karish was employed at the Heritage Group, the largest investor in defendant Brownstein's business.  Moreover, defendant Karish had the primary role of overseeing the Heritage Group's investment in defendant Brownstein's business. Defendant Karish never revealed this conflict to the Board nor that the wife of a previous employer accused him of fraud.

(c)      Defendant Sznewajs also failed to disclose conflicts of interest. Specifically, defendant Sznewajs did not inform the Board that as Chair of the Board's Audit Committee he approved the hiring of his son's firm to underwrite a Banc offering.

70.      Seabold and Salas alleged that defendant Schnel refused to investigate any of these related party transactions or allegations because to do so would severely undermine the legitimacy of the Board.  In short, the Special Committee sought to

- 17 -

protect themselves at the expense of the Company, and in doing so made a deal with the devil.

71.     On January 23, 2017, Defendants announced preliminary findings from the Special Committee's investigation.  In a press release, Defendants admitted that they previously misled investors about the independence of the October 2016 investigation into the ties between Galanis and Banc insiders.  Specifically, Defendants admitted that the earlier investigation was not directed by "disinterested" board members at all, but by "management," and that Winston & Strawn was not independent, having previously represented Banc and Sugarman personally.

72.     Further, Defendants disclosed that the SEC launched a formal investigation against Banc relating to the Galanis allegations.

73.     Importantly, Defendants did not confirm management's previous conclusion that there were no ties between Galanis and Sugarman and/or other Banc executives or directors. The reason was simple.  The Special Committee members did not want to implicate Sugarman and other executives in the underlying frauds committed by Galanis because to do so would mean that Sugarman and other executives would go public regarding the Special Committee members' own misconduct and related-party transactions.

**E.      The Board Enters into a Self-Interested and Conflicted Release Agreement with Sugarman**

74.     On the same day Defendants admitted to previously deceiving investors, Defendants disclosed that the Company had entered into an Employment Separation and Release with defendant Sugarman (the "Sugarman Release").  Pursuant to Section 5(a) of the Sugarman Release, Banc agreed to release all claims against defendant Sugarman, including "breach of fiduciary duty, breach of loyalty or other common law or tort causes of action."

75.     The Sugarman Release contains a blatant quid pro quo whereby defendant Sugarman and Banc agreed "not to initiate, file, cause to be filed, or otherwise pursue

any Released Claims, either as an individual on its own behalf or as a representative, member in a class, collective or derivative action."

76.    The Sugarman Release is therefore invalid because it represents a conflicted transaction between the Board and defendant Sugarman.  Both the Board and defendant Sugarman breached their fiduciary duties to the Company.  At the time when those facts were becoming public, the Board hastily agreed to release defendant Sugarman of liability without receiving any benefit for the Company.  As fiduciaries of Banc, the Board has a duty to act in the best interests of the Company at all times and to put the Company's interests before their own.  By agreeing beforehand not to initiate (or even investigate) defendant Sugarman's misconduct, the Board abdicated its fiduciary duties to Banc.

77.    The most reasonable explanation for the Board's agreement is that the directors sought a quid pro quo to ensure that defendant Sugarman did not disclose publicly the Board's repeated breaches of fiduciary duty so long as the Board agreed not to implicate defendant Sugarman.  This blatant over-reaching by the Board and defendant Sugarman completely undermines the Board's most basic fiduciary duties to Banc – *i.e.*, the duty to investigate wrongdoing and hold wrongdoers accountable.  Worse yet, the language of the Sugarman Release raises serious concerns that the Board imposed these drastic restrictions on the ability to pursue future claims in order to continue to conceal the Company's fraudulent business practices.

78.    In short, because the Board and defendant Sugarman had a confidential relationship with Banc (*i.e.*, they are or were fiduciaries of Banc at the time), the Defendants have the burden of proving that the release is valid and entirely fair to Banc.

## F.    The Special Committee Discloses Sham Conclusions Raising Serious Questions the Thoroughness and Honesty of the Investigation

79.    With the quid pro quo between the Board and Sugarman memorialized, the Special Committee conveniently disclosed its conclusions on February 9, 2017.  In the Company's press release, the Special Committee stated that a report had been generated

by WilmerHale, concluding that "there was no violation of law and that Jason Galanis had no direct or indirect control or undue influence over the Company." Further, the Special Committee concluded that it "did not find that any loan, related party transaction, or any other circumstance had impaired the independence of any director." Conveniently, the Special Committee did not disclose the report to public stockholders.

80.    The Special Committee also disclosed the scope of the investigation, which included "certain issues raised by the blog post, and items identified by the Special Committee, as well as questions raised by the KPMG Letter." The scope of the Special Committee's investigation was artificially circumscribed in order to avoid finding liability against anyone at Banc.

81.    For example, the Special Committee investigated only "certain issues raised by" the *Seeking Alpha* Article. Based on the conclusion that the Special Committee concluded that Galanis did not have "direct or indirect control or undue influence over the Company, it is clear that the Special Committee did not investigate whether Sugarman, Seabold, and Brownstein actually financed Galanis's personal and business fraudulent schemes while employed at Banc using the Company's assets and premises. As discussed below, the Seabold settlement agreement confirms that Sugarman, Seabold, and Brownstein were operating the Camden Capital entities from Banc's premises, and likely using Banc assets to do so.

82.    Further, the Special Committee disclosed that the scope was limited to "items identified by the Special Committee," but it is clear from the Seabold and Salas wrongful termination complaints that the Special Committee refused to investigate complaints relating to misconduct carried out by its own members.

83.    Moreover, the Special Committee seems to have limited its review of loans and related party transactions to the single determination as to whether those transactions "impaired the independence of any director." However, the *Seeking Alpha* Article, as well as complaints made by executives and employees, required an investigation into whether and to what extent the related party transactions were consistent with Company

- 20 -

1    policies and procedures, entirely fair to the Company, and properly disclosed by the
2    Board.

3        84.    Overall, the Special Committee's investigation was artificially limited in
4    bad faith.  One reasonable explanation for the investigation's limited scope is the Special
5    Committee's desire to avoid confrontation with defendants Sugarman, Brownstein, and
6    Seabold, who had insider knowledge about misconduct carried out by the Special
7    Committee members during their tenure as directors.

8    **G.    The Securities Action**

9        85.    The failure to disclose Sugarman's, Brownstein's, and Seabold's
10   relationship to Galanis caused the Company to be the subject of a class action securities
11   complaint filed in Federal Court (the "Securities Action").  The Securities Action alleges
12   that between October 29, 2015 and January 20, 2017 the Company and Sugarman (1)
13   omitted material information from their public statements about numerous connections
14   Sugarman and other top Banc executives and directors had with Galanis; (2) misled
15   investors about the independence of Banc's "disinterested directors" in its SEC filings in
16   connection with their approval of related-party transactions; and (3) failed to disclose
17   that Banc's management was in the midst of an internal investigation into the Company's
18   ties with Galanis.

19       86.    Specifically, the Securities Action alleged, *inter alia*, that:

20           (a)    Defendants caused the Company to make false and misleading
21       statements in its quarterly and annual reports that omitted critical details with
22       respect to related-party transactions.  The annual reports were singed by
23       defendants Sugarman, Brownstein, Sznewajs, Holoman, Karish, Schnel, and
24       Benett;

25           (b)    Defendant Sugarman made false and misleading statements regarding
26       the leadership structure at Banc, including heaping praise on the Company's
27       "independent" directors, when such directors were not independent; and

28           (c)    Defendants caused the Company to file a false and misleading Proxy

Statement on April 15, 2016, which touted Sugarman's involvement with COR but failed to disclose the ties Sugarman and those companies had to Galanis.

87.     The complaint in the Securities Action alleged that these statements were false and misleading because:

(a)     By October 29, 2015, Defendants knew, or were reckless in not knowing, that Galanis had been charged with criminal and civil securities fraud and Banc was undertaking an internal investigation into ties between Galanis and Banc insiders.  When the above statements were made, Defendants were aware, or recklessly disregarded, that Sugarman, Seabold and Brownstein all had ties to Galanis and that Galanis was using COR to perpetrate the Tribal Bond Scheme.  Defendants also knew, or recklessly disregarded, that Camden, which was owned and/or controlled by Sugarman and Seabold, was used to finance Galanis amidst the Tribal Bond Scheme and engaged in transactions with Galanis during the Gerova fraud. Defendants knew or recklessly disregarded that these facts would adversely affect Banc's reputation and concealment of the facts was placing shareholders at risk;

(b)     With regard to the "Related-Party Transactions" section of the 3Q15 10-Q, Defendants knew, or recklessly disregarded and failed to disclose, that Brownstein, who was responsible for reviewing and approving Banc's related-party transactions, was not independent.  Defendants knew, but failed to disclose, that because of Brownstein's material financial ties with Sugarman, he did not meet the NYSE Corporate Governance Listing Standards for director independence when the related-party transactions concerning Palisades and CS Financial were reviewed and approved by the Board; and

(c)     Banc's "tone at the top," for which Sugarman as Banc's CEO had ultimate ownership responsibility, was not one that emphasized best business practices or honest and complete disclosures.  Banc's admitted material weaknesses in Banc's internal controls meant that Defendants were able to

conceal Sugarman, Brownstein and Seabold's relationships with Galanis.

88.     On September 6, 2017, the Federal Court denied Banc and Sugarman's motion to dismiss the complaint in substantial part, finding that the lead plaintiff in the Securities Action had sufficiently alleged that certain statements, including notably the Company's 2015 proxy statement, were false and misleading.  The Federal Court concluded this despite the materially heightened pleading standard required by the Private Securities Litigation Reform Act of 1995.

## H.     The Board Settles Seabold's Wrongful Termination Lawsuit and Admits That the *Seeking Alpha* Article Was Right All Along.

89.     As discussed above, on September 5, 2017, Seabold filed a wrongful termination lawsuit against Banc alleging that the Special Committee members charged with independently investigating the claims of related party transactions and self-dealing had not done so in good faith, but rather had "scapegoated" Sugarman, Brownstein, and others as part of a "power grab" to conceal their own improper relationships and transactions.

90.     Prior to the filing of an amended complaint, which likely would have included additional damaging facts about the current Board, on February 14, 2018, the Company and Seabold entered into a settlement agreement, which was filed with the SEC as an exhibit to the Company's February 28, 2018 Annual Report on Form 10-K.  As part of the settlement, defendant Seabold received $4,325,641.70 in total cash compensation as well as a broad release "to the full extent permitted by law, of and from any and all claims, known and unknown, asserted and un-asserted."

91.     The Seabold settlement agreement contains a shocking admission connecting Banc, Sugarman, and Seabold to Galanis and his previous fraudulent schemes.  According to Section 9, Seabold was forced to represent that *as of the Effective Date* (February 22, 2018), Camden Real Estate Opportunity Fund had been wound down and had been (or was in the process of being) dissolved.  Further, Seabold admitted to having an ownership interest in Camben Capital Partners, which was using

the Banc's location as its principal office.  In essence, the Seabold settlement contains smoking-gun evidence that shows the Board provided releases to Sugarman and Seabold with knowledge that they were using Banc's principal office, and likely capital, to assist and/or finance Galanis's fraudulent scheme.

92.   Even worse, counsel for the Company that executed the settlement agreement on Banc's behalf was none other than MoFo, the same firm that wrongfully refused Plaintiff's Demand in this Action and purports to be assisting the Board with an "independent" investigation.

93.   The Seabold settlement agreement has little to do with what was in the Company's best interests and everything to do with quieting defendant Seabold's accusations against his former colleagues.  As with the Sugarman Release, the Defendants have the burden of proving that the release is valid and entirely fair to Banc. Most importantly, the Seabold settlement agreement contains evidence that the Board has been less than forthcoming with investors and supports a finding that the previous WilmerHale investigation was not conducted in good faith.

**DERIVATIVE AND DEMAND ALLEGATIONS**

94.   Plaintiff brings this action derivatively in the right and for the benefit of Banc to redress the breaches of fiduciary duty and other violations of law by Defendants.

95.   Plaintiff will adequately and fairly represent the interests of Banc and its shareholders in enforcing and prosecuting its rights.

96.   In light of the events described herein, and in accordance with Maryland law, on November 15, 2017, Plaintiff sent the Demand to Sznewajs, Banc's Chairman of the Board, demanding that Banc's Board investigate and take legal action against those responsible for the damages the Company has suffered and is certain to suffer.  *See* Exhibit A.

97.   On December 4, 2017, Plaintiff received a letter from MoFo, on behalf of the Board, stating, "[w]e are evaluating your request and will respond in due course.  We expect that you will not initiate any litigation purportedly on behalf of the Company

- 24 -

1 │ without further communication from us." *See* Exhibit B.

2 │     98.    The "further communication" arrived by way of the Refusal on January 8,

3 │ 2018.  Therein, Mr. McDonald of MoFo informed Plaintiff as follows:

> As I'm sure you know, a purported shareholder derivative lawsuit was
> previously filed and is pending, and the Company has filed a motion to
> dismiss that action on the grounds among other that the shareholder failed
> to make a demand on the Company nor established that demand would
> have been futile.  ***The Company has determined that it would be
> inappropriate for the Company to assert claims directly while that
> purported shareholder derivative action is pending***.

*See* Exhibit C.  (Emphasis added).

    99.    The Board has constructively refused Plaintiff's Demand, and has shown, through its several rounds of sham investigations and misrepresentations about its own role in the wrongdoing alleged herein, that it cannot be expected to and will not pursue in good faith the valuable claims available to the Company.

    100.   On June 25, 2018, Mr. McDonald again wrote to Plaintiff's counsel, now asserting that in light of the dismissal of the Demand Futility Action, Mofo and the Board were prepared to move forward with an investigation regarding the matters asserted in the Demand.  A true and correct copy of this correspondence is attached hereto as Exhibit D.  Notably, Mofo did not in any way address Plaintiff's assertions, in this Action, that Mr. McDonald and Mofo could not act as independent counsel and that the Board violated its fiduciary obligations in response to the Demand by referring it to non-independent counsel.

    101.   Even if, on its own, the decision to defer the investigation pending the outcome of the Demand Futility Action was proper (and it was not), any purported investigation taking place now is fatally flawed and crippled by the Board's original (and continued) engagement of conflicted, non-independent counsel.  Stated another way, the Board continues to rely on conflicted counsel when assessing credible allegations of substantial and systemic wrongdoing.

    102.   MoFo is hopelessly conflicted for several reasons. ***First,*** since 2017, MoFo

has been Banc's counsel of choice in numerous matters, including cooperation agreements, asset purchase agreements, reviewing executive compensation, and, as discussed herein, employment related litigation.  Large, full-service law firms do not maintain lucrative engagements with publicly traded corporations by determining that their clients breached their fiduciary duties.

103.   **Second,** Mr. McDonald and MoFo have served and are serving as defense counsel in the Demand Futility Action, as well as in the Securities Action, and were doing so when the Demand was issued to the Board.  Thus, the Board referred the Demand to decidedly non-independent counsel, in violation of the Board's fiduciary obligations to respond independently and in good faith to a shareholder demand.

104.   Indeed, under such circumstances, the response to the Demand could not have been, and is not, the product of independent, good faith business judgment.  Mr. McDonald and MoFo, in light of their engagement as defense counsel in the Demand Futility Action and the Securities Action, could not have conducted or assisted the Board with a truly independent investigation or evaluation of the allegations asserted in the Demand, or the claims arising therefrom.

105.   After all, many of these allegations are the very same allegations that Mr. McDonald and MoFo have been engaged to defend against, as zealous advocates, in related civil litigation.

106.   During the course of the Securities Litigation, Mr. McDonald and MoFo have already demonstrated that they have prejudged the allegations of the Demand and concluded they are without merit.  In the motion to dismiss filed on behalf of the Company in the Securities Action, MoFo adopted the arguments of certain individual defendants named in the Demand and this action, whom MoFo is now charged with independently investigating.  For example, Mofo and Mr. McDonald have asserted, *inter alia,* that:

- "…***it is implausible that Defendants were trying to mislead*** about the Winston investigation by omitting Winston's prior work."

- "Plaintiff pleads no facts showing any Defendant acted with scienter in 'concealing' the alleged 'associations' between the Company and Galanis, or Mr. Brownstein's alleged lack of independence. ***On this point, the Company refers also to the separate briefs filed by Mr. McKinney and Mr. Sugarman***."

- "***With respect to Mr. Sugarman***…it makes no sense that anyone could believe that 'concealing' that information would mislead investors…"

Securities Action at ECF 43; 61. (Emphasis added).

107.   Mr. McDonald and MoFo were also counsel to the Company in the Demand Futility Action wherein, in moving to dismiss that action, Mr. McDonald and MoFo argued that several directors (several of whom are defendants here) did not face a substantial likelihood of liability for the alleged breaches of fiduciary duty and other misconduct.

108.   Given MoFo's representations to this Court that Defendants committed no wrongdoing, and that any investigation or assertion of claims against Defendants could undercut the defense of the Securities Action, MoFo could not act as independent counsel to the Board and fairly and independently investigate the allegations in the Demand.

109.   Even if MoFo is independent, which it certainly is not, the Board (or any committee thereof) is incapable of properly evaluating the Demand because the Board permitted the Company to enter into numerous sham releases with the intent of blocking derivative litigation against the wrongdoers.  For instance, the Board authorized the Company to enter into a release with defendant Sugarman whereby Banc agreed not to "initiate, file, cause to be filed, or otherwise pursue any Released Claims, either as an individual on its own behalf or as a representative, member in a class, collective or derivative action" against defendant Sugarman.  The release artificially constrains the Board in violation of their fiduciary duties.  Because the Board cannot "otherwise pursue any Released Claims" against Defendant Sugarman, the language of the release, on its face, prohibits the Board from conducting a good faith investigation into the factual

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

events and claims giving rise to the Demand.  As such, the release is in effect a blanket, standing refusal by the Board to assess any demand for action against Defendant Sugarman.

110.   In light of the foregoing, the Board's refusal is improper, demonstrating the Board's lack of good faith, and confirming that Plaintiff should be allowed to proceed and to prosecute this action derivatively on behalf of the Company.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

111.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to act loyally and in good faith when taking actions in their capacities of fiduciaries of Banc.  Specifically, Defendants had the following duties to Banc:

(a)    ensure that Banc disseminated accurate, truthful and complete information to its shareholders;

(b)    adequately oversee and enforce the Company's policies and procedures relating to related party transactions;

(c)    exercise loyalty in the oversight of the Company's business practices;

(d)    conduct any investigations in good faith and in the best interests of the Company;

(e)    fully investigate and report any known misconduct, including misconduct that would harm the reputation of the Company; and

(f)    negotiate and settle any lawsuits in the best interests of the Company and not for personal reasons.

113.   Defendants violated their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Banc shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases,

- 28 -

conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

114.   Defendants further violated their duties of loyalty and good faith by willfully ignoring obvious and pervasive problems with Banc's internal controls and practices and procedures relating to related party transactions and failed to make a good faith effort to correct these problems or prevent their recurrence.

115.   Defendants further violated and breached their fiduciary duties of loyalty and good faith by failing to conduct a reasonable inquiry into known violations of law or other misconduct that threatened the reputation of the Company.

116.   Defendants further violated and breached their fiduciary duties of loyalty and good faith by actively concealing known misconduct through the establishment of special committees designed to suppress and obscure the truth.

117.   Defendants further violated and breached their fiduciary duties of loyalty and good faith by entering into settlement agreements with known wrongdoers with the intent of silencing any dissent that would implicate the Board in any misconduct.

118.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Banc, for which they are legally responsible.

119.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Banc in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Banc's affairs and in the use and preservation of Banc's assets.

120.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

121.   Plaintiff incorporates by reference and realleges each and every allegation

- 29 -

set forth above, as though fully set forth herein.

122.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Banc.

123.   Plaintiff, as a shareholder and representative of Banc, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT III
## AGAINST ALL DEFENDANTS FOR CORPORATE WASTE

124.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    By their wrongful acts and omissions, Defendants wasted the corporate assets of Banc through subsequent engagements and investigations conducted by Winston & Strawn and WilmerHale, which were neither conducted in good faith nor for the benefit of Banc.

126.   Further, Defendants wasted corporate assets by agreeing to early termination payments to wrongdoers as a quid pro quo to ensure that those wrongdoers would not implicate the directors in breaches of fiduciary duty.

127.    As a result of this waste of corporate assets, Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing Banc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described

1  herein, including, but not limited to, putting forward for shareholder vote resolutions for
2  amendments to the Company's By-Laws or Articles of Incorporation and taking such
3  other action as may be necessary to place before shareholders for a vote a proposal to
4  strengthen the Board's supervision of operations and develop and implement procedures
5  for greater shareholder input into the policies and guidelines of the Board;

6      C.      Awarding to Banc restitution from Defendants, and each of them, and
7  ordering disgorgement of all profits, benefits and other compensation obtained by the
8  Defendants;

9      D.      Awarding to Plaintiff the costs and disbursements of the action, including
10  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

11      E.      Granting such other and further relief as the Court deems just and
12  proper.

### JURY DEMAND

14      Plaintiff demands a trial by jury.

DATED:  July 12, 2018                    ROSMAN & GERMAIN LLP

_____
                                         DANIEL L. GERMAIN (143334)

                                         16311 Ventura Blvd., Suite 1200
                                         Encino, CA 91436-2152
                                         Telephone: (818) 788-0877
                                         Facsimile: (818) 788-0885
                                         Germain@Lalawyer.com

- 31 -
FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JAMES M. FICARO
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
MARK LEBOVITCH
DAVID MACISAAC
1251 Avenue of Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
MarkL@blbglaw.com
David.Macisaac@blbglaw.com

**RM LAW, P.C.**
RICHARD A. MANISKAS
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
(P) 484-324-6800
(F) 484-631-1305
rmaniskas@rmclasslaw.com

*Counsel for Plaintiff*

FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





THE
**WEISER**
LAW FIRM
WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

November 15, 2017

Robert D. Sznewajs
Chairman of the Board
Banc of California, Inc.
3 MacArthur Place
Santa Ana, CA 92707

Re:     **Demand Pursuant to Maryland Law**

Dear Mr. Sznewajs:

This firm represents Colleen Witmer (the "Stockholder"), a current stockholder of Banc of California, Inc. ("Banc" or the "Company").  Pursuant to Maryland law, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") conduct an investigation in good faith and take action to remedy breaches of fiduciary duties and other serious misconduct by certain current and/or former directors and executive officers of the Company, including yourself ("Sznewajs"), Steven A. Sugarman ("Sugarman"), Ronald J. Nicolas, Jr., James J. McKinney ("McKinney"), Chad T. Brownstein ("Brownstein"), Halle J. Benett ("Bennett"), Douglas H. Bowers, Mary A. Curran, Bonnie G. Hill, Jeffrey Karish ("Karish"), Richard J. Lashley, Jonah F. Schnel ("Schnel"), W. Kirk Wycoff, Hugh Boyle ("Boyle"), John A. Bogler, Eric L. Holoman, J. Francisco A. Turner ("Turner") and Jeffrey T. Seabold ("Seabold"). Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

As you are aware, by reason of their positions as officers and/or directors of Banc and because of their ability to control the business and corporate affairs of Banc, members of Management owed and owe Banc and its shareholders the fiduciary obligations of good faith, loyalty, and due care.  Management was and is required to use its utmost ability to control and manage Banc in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations.  Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws.  The Stockholder believes that Management has violated these core fiduciary duty principles from at least October 2015 through the present (the "Relevant Period"), causing Banc to suffer damages. More specifically, the Stockholder believes that Management has caused the Company to be harmed through its concealed relationships with Jason Galanis ("Galanis") as well as undisclosed

1

conflicts of interest and accounting manipulation, thereby exposing the Company to massive liability.

## I.   FACTUAL BACKGROUND

### A.   Allegations Emerge About Banc's Relationship with Galanis

According to its public filings, Banc is a financial holding company operating in commercial banking, mortgage banking, financial advisory, and corporate banking. Banc is the parent of Banc of California, National Association, a national bank.

On October 18, 2016, a blog post on *SeekingAlpha* alleged the existence of a web of improper and dangerous relationships between Galanis, a Los Angeles financier and convicted securities fraudster, and Banc's senior managers, including Sugarman, then Banc's Chief Executive Officer ("CEO"), and Brownstein, then Banc's Lead Independent Director (the "*SeekingAlpha* Article").

On the day the *SeekingAlpha* Article was posted, Banc immediately sought to quell the crisis in a press release, stating that it had been aware of the Galanis allegations for some time, but that Banc's Board, acting through "disinterested directors," had already conducted an "independent" investigation of the matter "led by Winston & Strawn," a law firm that was supposedly serving as independent counsel. Banc's press release went on to attempt to discredit the allegations in the *SeekingAlpha* Article and denied the existence of ties between Galanis and Banc. On October 19, 2016, these denials were repeated and reinforced by Banc's General Counsel in an investor conference call.

On or about October 27, 2016, Banc's Board created a Special Committee to purportedly investigate the alleged improper relationships and transactions. On January 23, 2017, Banc reported the Special Committee's conclusion that the Galanis allegations were false, but also disclosed that its October 18, 2016 response to the *SeekingAlpha* Article post had triggered an U.S Securities and Exchange Commission ("SEC") investigation.

On January 23, 2017 Banc would admit that the October 18, 2016 press release had misled shareholders about the earlier, so-called "independent" investigation. Specifically, Banc admitted that the earlier investigation was not directed by "disinterested" board members at all, but by "management," and that Winston & Strawn was not independent, having previously represented Banc and Sugarman personally.

From 2011 through the Relevant Period, Sugarman owned COR Capital LLC ("COR"), the entity that led the 2010 recapitalization of Banc predecessor, FPB. According to research conducted by the *SeekingAlpha* article's author, before and during the Relevant Period, COR was part of a group of companies and investment-related entities controlled by Galanis, a known securities fraudster.

Although investors were unaware of Galanis's ties to Banc and its top leadership, Galanis' white collar criminal activities were no secret. On September 24, 2015, prior to the start of the

Relevant Period, the United States Department of Justice ("DOJ") and the SEC charged Galanis with orchestrating multiple schemes to defraud investors of millions of dollars. From 2009 to 2011, Galanis, along with six others, engaged in a scheme to defraud the shareholders of a publicly-traded company called Gerova Financial Group, Ltd. ("Gerova") by obtaining secret control over millions of shares of Gerova stock and then manipulating the market for the stock as the defendants caused their secretly held shares to be sold. As part of the scheme, Galanis fraudulently generated demand for Gerova stock by bribing investment advisers to purchase for client accounts the Gerova stock that was sold by Galanis and others, thereby enabling Galanis to cash out from the scheme and make millions in illegal profits. Galanis pled guilty to these charges in July 2016 and was sentenced to a six-year prison term in February 2017.

In May 2016, while out on bail for the Gerova fraud, the DOJ and SEC again criminally and civilly charged Galanis with securities fraud, this time in connection with orchestrating a Ponzi scheme to defraud investors and a Native American tribal entity of tens of millions of dollars ("Tribal Bond Scheme"). A former director of Sugarman's COR Securities, Hugh Dunkerly ("Dunkerly"), was also charged with securities fraud in connection with the Tribal Bond Scheme. Between 2014 and 2016, Galanis, Dunkerly and other co-conspirators induced a Native American tribal entity to issue bonds based on lies about how the bond proceeds would be invested. Galanis and the others pocketed the bond proceeds to pay for their own personal expenses, homes, cars, travel, and jewelry. Galanis also allegedly defrauded unwitting investors into buying the bonds by hiding material facts about them, including their lack of liquidity. Galanis pled guilty to the Tribal Bond Scheme in January 2017.

As disclosed in the *SeekingAlpha* Article, Sugarman's COR and Galanis controlled the same offshore insurance company, Valor Group ("Valor"), a Bermuda-based insurance holding company. Valor and its subsidiaries were central to the Tribal Bond Scheme and were controlled by Galanis to carry out the fraud. According to the SEC, Galanis controlled Valor and its subsidiaries to finance the purchase of investment managers, who in turn purchased the Tribal Bonds on behalf of their clients. Sugarman's brother, Jason Sugarman, who was also a consultant with one of Banc's subsidiaries, was chairman and CEO of Valor during the Tribal Bond Scheme. Dunkerly, a former COR director, incorporated Valor while still at COR, and served as President of Valor while still at COR.

As disclosed in the *SeekingAlpha* Article, and confirmed by public records, Valor's subsidiary Wealth-Assurance, who also played a role in the Tribal Bond Scheme, was part of COR. Wealth-Assurance's website confirms that in 2014 it was "majority-owned by the strong US financial group COR Capital." Burnham Securities, who acted as the placement agent in the Tribal Bond Scheme, was also part of COR and, according to documents obtained by the SEC, operated out of the same building as Banc's corporate headquarters during the fraud.

In addition to his control over Valor, as disclosed in the *SeekingAlpha* Article, documents obtained by the SEC in their investigation of the Tribal Bond Scheme show that Galanis used COR to demonstrate his financial backing to acquire the investment firms used to perpetrate the fraud. A June 2014 email from Galanis to a co-conspirator attached a document titled "Introduction to COR Capital," which Galanis used to demonstrate his financial backing for acquisition of the investment firms. During the Tribal Bond Scheme, Galanis also represented to his co-conspirators

3

that he controlled companies associated with COR, including COR itself. According to the SEC, Galanis installed officers at COR to conceal his control.

Before and during the Relevant Period, Sugarman also held a majority interest in an entity named JAS Partners 1, LLC ("JAS Partners"). JAS Partners, along with Banc's Vice-President Seabold, controlled Camden Capital Partners, LLC and its off-balance sheet lender Camden Real Estate Opportunity Fund I (collectively "Camden"). According to the *SeekingAlpha* Article, and based on public records, in 2014 and 2015, Camden was used to finance Galanis amidst the Tribal Bond Scheme and was utilized for transactions with Galanis during the Gerova securities fraud.

The research conducted in support of the *SeekingAlpha* Article also revealed ties between Galanis and Banc's Lead Independent Director Brownstein. In 2011, a private investment firm run by Brownstein was a major investor in Prospect Global Resources Inc. ("Prospect Global") and Brownstein served as Vice Chair of the company. According to the SEC complaint in the Gerova fraud, Galanis transferred proceeds he fraudulently obtained from Gerova to Prospect Global, which the SEC identified as a company Galanis controlled. As disclosed in the *SeekingAlpha* Article, Brownstein, through his investment company, along with Galanis's wife, were shareholders of Prospect Global's 2011 reverse merger entity.

By the start of the Relevant Period, Management was aware of the above-alleged ties between Galanis and Sugarman, Brownstein and Seabold. In 2015, Banc's management became aware of and initiated an internal investigation into Galanis' control over COR. Not only was Management aware of Galanis' lengthy history of white collar financial crime, including indictments for taking control of Gerova and defrauding shareholders, they were also aware that Galanis was using Banc's name in connection with the Tribal Bond Scheme and was controlling COR to run that scheme out of the same building as Banc's headquarters. Although Management knew of Galanis's ties to Sugarman, Brownstein and Seabold, and Galanis's control of COR, they were motivated to conceal these facts from investors, as well as Banc's internal investigation, because of the impact such material information would have on Banc's integrity and reputation, including the reputation Sugarman had built for Banc as a community leader.

Although the Galanis allegations were allegedly discredited, Sugarman and Brownstein were nevertheless promptly forced out of the Company. With their departure, members of the Special Committee were able to secure control of Banc, and in doing so, divert attention away from their own misconduct.

### B.    Allegations Emerge Regarding Conflicts of Interest and Accounting Manipulation

In a recently filed wrongful termination lawsuit against Banc, former top Banc officer Seabold alleges that the Special Committee members charged with independently investigating the claims of related party transactions and self-dealing had not done so in good faith, but rather had "scapegoated" Sugarman, Brownstein, and others as part of a "power grab" to conceal their own improper relationships and transactions.

Seabold alleges that Benett, Karish, Sznewajs, and Schnel, each with Banc since at least 2013, took advantage of the Galanis allegations to force out founders, whistleblowers, and any others who attempted to ensure Banc complied with its disclosure and financial reporting obligations. According to Seabold, several members of Management suffered from actual, undisclosed conflicts of interest, but were able to misuse the Special Committee to divert attention away from their own misconduct and secure control of Banc.

According to Seabold, these individuals, along with the newly installed management, even went so far as to manipulate financial results for the first quarter of 2017.

Seabold alleges that as Sugarman, Brownstein, and Seabold became the targets of the Special Committee's investigation, Sugarman expressed his concerns to Schnel that Benett had himself been violating the Banc's corporate opportunities and conflict of interest policies, and suffered from his own undisclosed conflicts of interest. According to Seabold, Defendant Benett's conflicts extended back to 2014, when he was employed by KBW, Inc., an investment banking firm, which did work with Banc and its competitors, a relationship which should have been disclosed.

Seabold alleges that the Nominating and Governance Committee, of which Schnel was a member, failed to take any action against Benett because, according to Seabold, Karish was involved in similar related party transactions. Seabold alleges that Karish also suffered from undisclosed conflicts of interest. According to Seabold, Karish was employed by Heritage Group, a large investor in a separate business owned by Brownstein.

Seabold also alleges that Karish served on the board of another public company previously accused on *SeekingAlpha* of fraudulent business practices, something Karish never revealed to the Board. Seabold alleges that following the Galanis post, tipsters contacted Banc to alert the Board that Karish had been accused of breaching his fiduciary duties in a prior case and had used the "investigation" of those allegations to entrench himself. Seabold further alleges that Banc employees responsible for compliance insisted that Karish be reviewed for conflicts of interest, but that Karish had refused. Seabold claims that those Banc employees who insisted on the review no longer work for Banc.

Seabold also claims that Sznewajs was likewise involved in undisclosed self-dealing. According to Seabold, Sznewajs never disclosed that he, as Chairman of the Audit Committee, had approved hiring his son's firm to underwrite an offering by Banc.

Seabold's complaint provides detailed allegations about how the members of the Special Committee advanced their own personal interests by targeting longtime Banc employees and Board members for removal. Despite never uncovering evidence of any improper relationships between Banc and Galanis, Benett, Karish, Sznewajs, and Schnel successfully manipulated the Special Committee to achieve their goal of removing Sugarman and others from the Company and assuming control.

Seabold also alleges that as part of the scheme, Banc's management, with apparent approval of the Audit Committee, artificially inflated Banc's first quarter 2017 financial results.

According to Seabold, shortly after the Individual Defendants' "power grab," it became apparent as early as January 2017 that Banc would fall short of consensus operating results for the first quarter 2017.

During this period, Seabold alleges firsthand communication with Banc's Interim CEO who stated that the Company was going to miss consensus earnings estimates and needed to generate revenue to cover the shortfall. Seabold alleges that shortfall was either known to the Audit Committee or recklessly disregarded by it. Yet the Company continued to provide the market with public guidance that Banc would achieve $2.00 earnings per share (EPS) for the year.

Seabold alleges that Banc's new leadership refused to cut guidance and risk exposing their unlawful acts and self-dealing. Instead, they chose to manufacture earnings by causing Banc to improperly reverse bonus accruals to appear more profitable.

To implement this plan, Banc's new leadership eliminated the standard transparency from the financial reporting and budgeting processes and even turned off the SOX compliance reports that went out to management. They then initiated a so-called "reassessment" for accruals for 2016 bonuses. This resulted in reversing $7.8 million in accruals, which were then credited toward liabilities accrued in the first quarter 2017. There was no legitimate reason to reverse these accruals. It also resulted in earned, guaranteed performance-based bonuses not being paid to Seabold and others, despite Banc's obligation to do so.

Seabold also alleges that there are presently significant material weaknesses in Banc's internal controls. Banc's most recent Form 10-K acknowledged that its independent auditor, KPMG, reported a material weakness in Banc's internal controls over financial reporting. Sznewajs, who served as Chairperson of the Audit Committee overseeing Banc's faulty financial reporting, is now Chairperson of the Board despite failing to correct the material weaknesses identified by KPMG.

Finally, Seabold alleges that the Individual Defendants sought to blame Banc's departed executives for the material weakness in Banc's internal controls over financial reporting. Seabold alleges that Banc sought to blame him and others by stating in the same Form 10-K that the Company had been suffering from a "tone at the top" that did not prioritize "internal control over financial reporting." Seabold alleges that the three individuals in fact most responsible for the material weakness identified by KPMG (Boyle, Sznewajs. and Turner) not only were not disciplined but were *promoted* to top positions at Banc.

### C.   The Securities Action

The failure to disclose Banc's relationship with Galanis caused the Company to be the subject of a federal securities class action in the U.S. District Court for the Central District of California (the "Federal Court") captioned *In re Banc of California Securities Litigation*, SACV-17-00118 AG (DFMx) (the "Securities Action"). The Securities Action alleges that between October 29, 2015 and January 20, 2017 the Company and individual defendants Sugarman and McKinney omitted material information from their public statements about numerous connections Sugarman and other top Banc executives and directors had with Galanis; (2) misled investors about the independence of Banc's "disinterested directors" in its SEC filings in connection with their

approval of related-party transactions; and (3) failed to disclose that Banc's management was in the midst of an internal investigation into the Company's ties with Galanis.

On September 6, 2017 the Federal Court denied Banc, Sugarman, and McKinney's motion to dismiss the complaint in part, finding that the lead plaintiff in the Securities Action had sufficiently alleged that certain statements, including notably the Company's 2015 proxy statement, were false and misleading. The Federal Court concluded this despite the materially heightened pleading standard required by the Private Securities Litigation Reform Act ("PSLRA").

## II.    DEMAND PURSUANT TO MARYLAND LAW

Based on these events, the Stockholder contends that Management: (1) breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of the Company's business, by failing to disclose the Company's relationship with Galanis along with the myriad of conflicts described herein; and (2) breached their fiduciary duties by engaging in the manipulation of the Company's financials and internal controls to advance their own interest.

Accordingly, pursuant to Maryland law, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Maryland and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Pursuant to Maryland law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

**THE WEISER LAW FIRM, P.C.**

Robert B. Weiser

**RM LAW, P.C.**

Richard A. Maniskas

B

**MORRISON | FOERSTER**

707 WILSHIRE BOULEVARD
LOS ANGELES
CALIFORNIA  90017-3543
U.S.A.

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON  FOERSTER LLP

BEIJING, BERLIN, BRUSSELS, DENVER,
HONG KONG, LONDON, LOS ANGELES,
NEW YORK, NORTHERN VIRGINIA,
PALO ALTO, SACRAMENTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

December 4, 2017

Writer's Direct Contact
+1 (213) 892-5200

Robert B. Weiser
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA  19312

Richard A. Maniskas
RM Law, P.C.
c/o The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA  19312

Re:     Demand Pursuant to Maryland Law

Dear Messrs. Weiser and Maniskas:

        This firm represents Banc of California and is in receipt of your November 15, 2017 letter.  We are evaluating your request and will respond to you in due course.  We expect that you will not initiate any litigation purportedly on behalf of the Company without further communication with us.

        In connection with our consideration of your letter, please provide documentation of Ms. Witmer's ownership of Banc of California stock during the relevant period.

Very truly yours,

Mark R. McDonald

la-1367024

C

**MORRISON** | **FOERSTER**

707 WILSHIRE BOULEVARD
LOS ANGELES
CALIFORNIA  90017-3543
U.S.A.

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON  FOERSTER LLP

BEIJING, BERLIN, BRUSSELS, DENVER,
HONG KONG, LONDON, LOS ANGELES,
NEW YORK, NORTHERN VIRGINIA,
PALO ALTO, SACRAMENTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

January 8, 2018

Writer's Direct Contact
+1 (213) 892-5200

Robert B. Weiser
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA  19312

Richard A. Maniskas
RM Law, P.C.
c/o The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA  19312

Re:     Demand Pursuant to Maryland Law

Dear Messrs. Weiser and Maniskas:

As you know, this firm represents Banc of California (the "Company") and is in receipt of your November 15, 2017 letter demanding the Company investigate and take action against numerous officers and directors of the Company.  As I'm sure you know, a purported shareholder derivative action was previously filed and is pending, and the Company has filed a motion to dismiss that action on the grounds among others that the shareholder had failed to make a demand on the Company nor established that demand would have been futile. The Company has determined that it would be inappropriate for the Company to assert claims directly while that purported shareholder derivative action is pending. The Company will reevaluate your letter once any motions to dismiss the existing action are finally resolved.

If you have any questions, you may contact me.  You should not initiate litigation without further communication with me.

Very truly yours,

Mark R. McDonald

la-1369310

D

**MORRISON | FOERSTER**

707 WILSHIRE BOULEVARD
LOS ANGELES
CALIFORNIA 90017-3543
U.S.A.

TELEPHONE: 213.892.5200
FACSIMILE: 213.892.5454

WWW.MOFO.COM

MORRISON FOERSTER LLP

BEIJING, BERLIN, BRUSSELS, DENVER,
HONG KONG, LONDON, LOS ANGELES,
NEW YORK, NORTHERN VIRGINIA,
PALO ALTO, SACRAMENTO, SAN DIEGO,
SAN FRANCISCO, SHANGHAI, SINGAPORE,
TOKYO, WASHINGTON, D.C.

June 25, 2018

Writer's Direct Contact
+1 (213) 892-5200

*Via Email*

Robert B. Weiser
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA 19312

Re:    Demand Pursuant to Maryland Law

Dear Mr. Weiser:

In response to your November 15, 2017 letter (the "Demand Letter") demanding Banc of California ("Banc") investigate and take action against certain officers and directors, I advised you on January 8, 2018 that your Demand Letter would be reevaluated once the motions to dismiss the *Gordon v. Sznewajs et al.*, Case No.: SACV 17-01678-CJC(DFMx), Dkt. No. 70 (C.D. Cal. June 13, 2018) action were finally resolved. Banc was well within in its rights to defer action on your Demand Letter while the question whether a pending derivative action could proceed was awaiting decision. *See Maccoumber v. Austin*, 2004 WL 1745751 (N.D. Ill. Aug. 2, 2004) (finding that the board's "decision to postpone its investigation is reasonable given that it is currently litigating related issues in state court."); *Piven v. Ryan*, 2006 WL 756043 (N.D. Ill. Mar. 23, 2006) (finding board's decision to defer acting on shareholder demand pending outcome of demand futility litigation "reasonable" and that it would be "unreasonable" to expend corporation "resources unnecessarily"); *Lowinger v. Oberhelman*, 2017 WL 1224524 (C.D. Ill. Mar. 31, 2017) (same); *LR Trust v. Rogers*, 2017 WL 4161977 (N.D. Ga. Sept. 18, 2017) ("[T]he Court is unable to find that an issue of material fact exists as to reasonableness and good faith based on the [corporation]'s decision to not investigate the ongoing investigations/pending lawsuits at issue. Defendants are correct that the [corporation]'s deferral was an appropriate exercise of business judgment.").

On June 14, 2018, the court ruled that the *Gordon* complaint failed to establish that demand on the Banc's board of directors would have been futile and gave plaintiff 14 days to amend his complaint if he so chose. The plaintiff filed a notice of dismissal, on June 22.

la-1388392

**MORRISON** | **FOERSTER**

Robert B. Weiser
June 25, 2018
Page Two

        Consistent with my January 8, 2018 letter, the board is now prepared to consider the
allegations and requests in the Demand Letter.  The board will respond to your Demand
Letter after it has had an adequate and reasonable amount of time to do so.

        In my January 8, 2018 letter, I asked you to contact me if you had any questions
about the response to your Demand Letter, and I asked you "not [to] initiate litigation
without further communication with me."  Without any further contact from you, you hastily
filed a complaint on February 12, 2018, asserting incorrectly that Banc's board of directors
had wrongfully refused to act on your Demand Letter.  I asked your firm on June 22, 2018
whether you would dismiss the complaint now that we have stated that your Demand Letter
will be reevaluated now that the *Gordon* action has been dismissed.  Your firm refused.
Your firm's refusal to dismiss even though we have informed you that the board will take up
your Demand Letter is very disappointing and is not consistent with the fiduciary duties that
a shareholder derivative plaintiff owes to her corporation.

        You have advised that, rather than dismiss the complaint you filed, you intend to file
an amended complaint.  We ask that you attach a copy of this letter to any amended
complaint you file.

Very truly yours,

Mark R. McDonald

la-1388392

## BANC OF CALIFORNIA, INC. VERIFICATION

I, Colleen Witmer, hereby verify that I am familiar with the allegations in the Amended Complaint, and that I have authorized the filing of the Amended Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 7/10/18

COLLEEN WITMER